Frank **ACKLEY** d/b/a **Village Square Chevron, et al.**

v.

**GULF OIL CORPORATION, Chevron U.S.A., Inc. and Cumberland Farms, Inc.**

**ROBERT A. COHN/R.A.C. CAR SERVICE, INC.**

v.

**GULF OIL CORPORATION, Chevron U.S.A., Inc., and Cumberland Farms, Inc.**

**Civ. Nos. B–86–402 (EBB), B–87–370 (EBB) and B–87–716 (EBB).**

United States District Court, D. Connecticut.

May 5, 1989.

---

Richard W. Farrell, Carl T. Holt, John J. LaCava, Albert J. Barr, Tara Reilly, Farrell & Barr, Stamford, Conn., for plaintiffs.

Francis J. Sailer, Pillsbury, Madison & Sutro, Washington, D.C., Bruce W. McDiarmid, Robert P. Taylor, W. Jeffry Schmidt, Pillsbury, Madison & Sutro, San Francisco, Cal., pro hac vice for Gulf Oil Corp., and Chevron U.S.A., Inc.

Paul D. Sanson, James B. Pomeroy, Shipman & Goodwin, Mark P. Anderson, Hartford, Conn., for Cumberland Farms.

Richard M. Reynolds, Scott P. Moser, Day, Berry & Howard, James Sicilian, Steven M. Greenspan, Hartford, Conn., for Gulf Oil & Chevron.

Michael D. Sherman, Gerard P. Fox, Collier, Shannon, Rill & Scott, Washington, D.C., pro hac vice.

Mark G. Howard, Associate Gen. Counsel, Cumberland Farms, Inc., Canton, Mass., pro hac vice for Cumberland Farms, Inc.

James Ziogas, Jr., Ruggiero, Ziogas & Allaire, Bristol, Conn., for Williamson Auto Electric.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

ELLEN B. BURNS, Chief Judge.

Plaintiffs, seventeen Gulf Service station dealers, bring these actions challenging the transfer of their service station franchises from Chevron to Cumberland Farms. In their complaints in the three above-captioned consolidated cases, plaintiffs allege violations of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806, the Connecticut Petroleum Franchise Act ("CPFA"), C.G.S. §§ 42–133j to 42–133n, and the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S. § 42–110 *et seq.* Jurisdiction rests upon 15 U.S.C. § 2805(a) and 28 U.S.C. §§ 1331, 1332, 1337, 2201 and 2202.

Pending before the court are cross-motions for summary judgment. For the reasons set forth below, plaintiffs' motion are denied and defendants' motions are granted on all counts.

### I.

In 1984 Chevron U.S.A., Inc. ("Chevron") acquired the assets of Gulf Oil Corporation ("Gulf") for a purchase price of $13.2 billion. As a result of the acquisition, Chevron owned the seventeen service stations leased by the plaintiffs in the present action and contracted a corporate debt exceeding $15 billion. To reduce the accumulated debt Chevron initiated several studies to determine which of its assets, including those acquired from Gulf, might be appropriate candidates for sale. In the fall of 1985, Chevron solicited bids for the purchase of its retail operations in the ten New England and mid-Atlantic states.

Cumberland Farms, Inc. ("Cumberland") submitted the successful bid.[1]

On December 19, 1985, Chevron and Cumberland executed an Asset Purchase Agreement ("Purchase Agreement") pursuant to which Chevron agreed to sell, transfer and assign to Cumberland its real property and leasehold interests in approximately 500 retail gasoline service stations, including all of its stations in Connecticut, 20 petroleum product distribution terminals, 320 tanker trucks and other vehicles, various warehouses and related Chevron and Gulf inventories and supply contracts for approximately 300 independent Chevron and Gulf jobbers [2] and dealers in the northeast market ("Chevron sale" or "Chevron transaction").[3] The sale was allegedly structured to protect the continuity of dealer leases and supply contracts under the Gulf and Chevron trademarks. Section 2.5 of the Purchase Agreement expressly required Cumberland to assume all of Chevron's contractual commitments, including its trademark agreements, dealer leases and fuel supply agreements. Section 8.6 of the Agreement further required Cumberland, as franchise agreements came up for renewal, to "offer in good faith ... a new 'franchise' on terms and conditions which are not discriminatory" to each current dealer.[4]

Chevron and Cumberland also entered into several ancillary agreements related to the Purchase Agreement, two of which deserve comment. First, Chevron and Cumberland executed licensing agreements for the Gulf and Chevron trademarks. Cumberland purchased the right to use and authorize the use of the Gulf trademark, design and indicia for a period of 15½ years, at no royalty. Thereafter, Cumberland has the option to renew its Gulf trademark license for an unlimited additional period at an annual royalty of one million dollars. Cumberland also purchased the right to use the Chevron trademark for a "reasonable transition period." According to the agreement, franchisees were given the right to continue the use of the Chevron trademark for the longer of the remainder of the term of their existing franchise agreements or two years.[5]

Second, Chevron and Cumberland executed an ancillary product sales agreement whereby Chevron agreed to supply Cumberland Farms with the entire gasoline output of Chevron's Philadelphia refinery. This supply, along with purchases under an output agreement with a Canadian refinery and purchases on the New York Harbor Spot Market, satisfy substantially all of Cumberland's needs for fuel in the northeast market.

On February 14, 1986, after the Purchase Agreement was signed but before the transaction closed on May 31, 1986, Chevron notified all affected Gulf and Chevron branded dealers in the northeast market, including the plaintiffs, of the sale to Cumberland. The notice clearly evidenced that the transaction had been planned as an assignment, and explained to the dealers that:

[A]ll of Chevron's agreements with Chevron and Gulf jobbers and dealers in the

1. Cumberland Farms is presently the third largest convenience store chain in the United States, operating over 1200 convenience stores. Approximately half of Cumberland's convenience stores also market motor fuel. (Ex. AA, Gordon depo., pp. 92–93). Cumberland owns approximately 57 convenience stores selling gasoline within Connecticut. (Ex. BB, Lauro depo., pp. 38–40). Cumberland is not a refiner of petroleum products. (Gordon Aff., ¶ 20).

2. The terms "jobber" and "distributor", as used in the petroleum business, are synonymous. Characteristically, the jobber maintains storage tanks for the sale of gasoline and other petroleum products to dealers and other large end users.

3. The Chevron employee with primary responsibility for the sale of the Northeast marketing assets was Irwin M. Lichtblau. (Lichtblau Aff., ¶ 7).

4. Section 8.6 adopts the language of Section 102(b)(2)(E) of the PMPA, verbatim.

5. Nine of the plaintiffs purchased gasoline from Chevron pursuant to written product supply agreements for resale under the "Gulf" trademark. The other eight purchased gasoline for resale under the "Chevron" mark. These eight have recently converted to the "Gulf" brand. Chevron's agreement with all eight expressly permitted Chevron to change the mark under which Chevron sold gasoline to the dealers. (Schmidt Aff., Tabs 2J–2Q).

10–state area will be assigned to Cumberland Farms. Cumberland Farms will assume all of Chevron's obligations to its Chevron and Gulf jobbers and dealers under those agreements. (Plaintiffs' Ex. B)

The letter further advised dealers that:

Chevron does not believe that the sale to Cumberland Farms of Chevron's marketing assets in the Northeast and the assignment to and assumption by Cumberland Farms of Chevron's jobber and dealer agreements in that area triggers the PMPA or represents a termination or nonrenewal of your Dealer Contract of Sale, Service Station Lease (if any) and related agreements with Chevron ("dealer agreements"). Your dealer agreements with Chevron will be transferred to another supplier who will honor all of the terms and conditions of those agreements and will have the right to continue to authorize you to utilize the Gulf trademarks and brand name. You will retain all of your rights under the PMPA against Cumberland Farms, your new supplier.

On the chance, however, that someone might later claim that this transfer involves a termination or nonrenewal that is subject to the PMPA, we are taking the precaution of giving you formal notice of nonrenewal of your dealer agreements in accordance with the PMPA. We wish to repeat that in fact your agreements with Chevron will continue in full force and effect and will be renewed by Cumberland Farms—unless Cumberland Farms independently has grounds under the PMPA to terminate or not to renew those agreements. (Plaintiffs' Ex. B)

The February 14, 1986, notice indicated that existing franchise agreements between individual dealers and Chevron would expire as of the later of (i) 180 days after receipt of the notice, or (ii) the stated

expiration date of the current term of each agreement. On March 10, 1986, Chevron sent to all Gulf and Chevron dealers in Connecticut a second notice which modified the first notice in one respect. Specifically, the March 10, 1986, notice stated that the existing franchise agreements would expire one year after receipt of the notice or the stated expiration date of each agreement, whichever was later. The March 10, 1986, notice was also sent to the governor of the State of Connecticut.

The sale of Chevron's northeast marketing assets to Cumberland closed at midnight on May 31, 1986, for a purchase price of $250 million.[6] Beginning in February, 1987, and pursuant to the terms of the assignment, Cumberland sent franchise renewal documents to the dealers whose Chevron leases were soon to expire. Many of the proposed lease agreements contained substantial rent increases. According to the plaintiffs, the renewal documents imposed significantly increased burdens and responsibilities. Plaintiffs also challenge the presentation of the renewal documents as untimely.[7] Each of the dealers signed the new Cumberland Farms leases under protest, reserving his rights under federal and state law.

## II.

### A.  *Background*

Presently pending before the court are cross-motions for summary judgment on claims asserted by the plaintiffs in three consolidated cases. *Ackley, et al. v. Gulf Oil Corporation, et al.,* B–86–402 (EBB) (*"Ackley I"*), relates generally to the transfer of the franchises from Chevron to Cumberland. Plaintiffs' complaint contains four counts, the first three of which allege that: (1) defendants failed to provide plaintiffs a right of first refusal to purchase the properties under 15 U.S.C.

---

**6.** The December 19, 1985, Asset Purchase Agreement listed a purchase price of $310,207,000. That price was reduced to $238,500,000 prior to closing to reflect a reduction in the estimated values of the inventories and accounts receivable. On June 2, 1986, Chevron sent letters to all

Gulf and Chevron dealers in the Northeast advising that the sale to Cumberland had been completed. (Perkins Aff., ¶ 10; Ex. 7).

**7.** See Plaintiffs' Schedule A, attached to this decision.

§ 2802(b)(2)(E)(iii) of the PMPA; (2) defendants improperly terminated or nonrenewed the plaintiffs' franchises under the PMPA; and (3) defendants' actions violate CUTPA. Count Four sets forth a general demand for relief. Plaintiffs have moved for summary judgment on the first, second and fourth counts of their complaint. Defendants have moved for summary judgment on all counts, claiming that judgment should be granted in their favor because:

(a) the PMPA does not apply to the transaction since no termination or nonrenewal occurred, but rather a valid assignment took place;

(b) alternatively, the PMPA requirements for a market withdrawal were satisfied,

and

(c) defendants' actions did not violate CUTPA.

In the second action, *Ackley, et al. v. Gulf Oil Corporation, et al.*, B–87–370 (EBB) ("*Ackley II*"), plaintiffs challenge the new franchise agreements proposed by Cumberland. In three counts the complaint alleges that: (1) plaintiffs' franchises were automatically renewed under the Connecticut Petroleum Franchise Act, C.G.S. § 42–133j, *et seq.*; (2) Cumberland imposed significant rental increases in violation of the CPFA and the PMPA; and (3) defendants' actions violate CUTPA. Plaintiffs have moved for summary judgment on the first count of the complaint. Defendants have moved for summary judgment on all counts on the basis that:

(a) the plaintiffs are not franchisees within the meaning of the CPFA;

(b) Cumberland's proposed rent increases do not violate either the CPFA or PMPA;

and

(c) defendants' actions do not violate CUTPA.

The third action, *Robert A. Cohn/R.A.C. Car Service, Inc. v. Gulf Oil Corporation, et al.*, B–87–716 (EBB) ("*R.A.C. Car Service*"), sets forth the same counts and seeks the same relief as Ackley II.

B. *Standard of Review*

Under settled principles of law, this court must grant a motion for summary judgment if no issue of material fact is genuinely disputed and the movant is entitled to judgment as a matter of law. *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Fed.R. Civ.P. 56(a). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (Feinberg, C.J.), *cert. den.* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, "on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried." *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975).

The Supreme Court has recently written that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." (footnote omitted) *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with re-

spect to which she has the burden of proof.

*Id.* at 322–23, 106 S.Ct. at 2552.

The Court concluded that "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and ... designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

Likewise, in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court stated that:

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (citations omitted) (emphasis in original).

### III.  DISCUSSION

#### A.  *Ackley I*

The basic issue raised by the counts in *Ackley I* is whether Chevron's transfer of the plaintiffs' franchises to Cumberland Farms violated the PMPA. Plaintiffs claim that the "attempted delegation" of Chevron's franchise duties to Cumberland substantially altered the nature of the franchise relationship, and was therefore invalid under state law Uniform Commercial Code ("U.C.C.") principles. Thus, according to the plaintiffs, Chevron's invalid delegation was an "event of termination" under the PMPA. Plaintiffs also allege that Chevron's purported "market withdrawal" under PMPA is similarly invalid. (Plaintiffs' 9/30/88 brief, p. 30 *et seq.*)

Defendants, on the other hand, argue that the transfer of Chevron's assets to Cumberland was a proper and valid "assignment" under principles of Connecticut contract law. Defendants submit that a proper assignment of a franchise is neither a termination nor a nonrenewal of the franchise under PMPA standards, and accordingly plaintiffs are not entitled to invoke provisions of that statute. In the alternative, defendants argue that, if a termination or nonrenewal did occur, then Chevron satisfied all of the statutory conditions required for a proper market withdrawal under the PMPA.

■ The court notes at the outset that in order to establish a claim under the PMPA, the plaintiffs must prove as a threshold matter a termination or nonrenewal of their franchise relationship within the meaning of the PMPA. 15 U.S.C. § 2805(c). There can be no dispute that plaintiff franchisees bear the initial burden of proof on this issue.[8] If plaintiffs succeed in meeting their burden, the defendant franchisors then bear the burden of establishing as an affirmative defense that the termination or nonrenewal was permitted under the Act. *Lippo v. Mobil Oil Corp.*, 802 F.2d 975, 977 (7th Cir.1986), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1374, 94 L.Ed.2d 689 (1987); *Burns Bros., Inc. v. RMT Properties, Inc.*, 2 Bus.Fran.Guide (CCH) ¶ 8468, at 15,859 (D.Ore.1985).

■ As the parties apparently agree, the PMPA provides that the validity or invalidity of an assignment of a franchise is determined by reference to applicable principles of state law. Section 106(b) of the PMPA states:

> (b) Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or

---

**8.** Plaintiffs misconstrue the PMPA to the extent they argue that defendants bear the burden of proving the absence of a terminating event. (Plaintiffs' 10/21/88 brief, pp. 5, 7). § 105(c) of the PMPA clearly states:

> (c) In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise rela-

tionship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title, and, if applicable, that such franchisor complied with the requirements of section 2802(d) of this title.

assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

Pursuant to 15 U.S.C. § 2806(b), an assignment of a franchise, properly executed under applicable provisions of state law, does not constitute a termination or nonrenewal under the PMPA. *May–Som Gulf, Inc. v. Chevron U.S.A.*, 869 F.2d 917 (6th Cir. 1989); *McGee v. Gulf Oil Corp.*, 2 Bus. Fran.Guide (CCH) ¶ 8379 (N.D.Ala.1985); *Aldrich v. Amoco Oil Co.*, 2 Bus.Fran. Guide (CCH) ¶ 8322, 1985 WL 6098 (S.D. Iowa 1985).[9] On the other hand, if the assignment of a franchise is invalid under applicable state law principles, then the termination and nonrenewal provisions of the PMPA may be invoked for the protection of the franchisee. Courts have ruled that an invalid assignment "constructively terminates" a PMPA franchise, thereby affording the dealer PMPA protections.[10]

The Sixth Circuit recently addressed the issue of the burden of proof faced by a franchisee attempting to establish that a franchisor invalidly assigned and thereby constructively terminated a franchise. In *May–Som Gulf, Inc. v. Chevron, U.S.A.*, 869 F.2d 917 (6th Cir.1989), the appellate court affirmed a summary judgment in favor of the defendants in an action brought by former Gulf dealers challenging Chevron's sale of its marketing assets in the State of Ohio to Cumberland Farms.[11] The court held that the transaction was a valid assignment which did not trigger the PMPA, and that, even if the transaction did involve a termination or nonrenewal, Chevron and Cumberland fully complied with the market withdrawal requirements of the PMPA. Specifically with regard to the burden of proof, the Sixth Circuit held:

> [T]hat to sustain a claim, under the PMPA, that a franchisor assigned and thereby constructively terminated a franchise agreement, the franchisee must prove either: (1) that by making the assignment, the franchisor breached one of the three statutory components of the franchise agreement, (the contract to use the refiner's trademark, the contract for the supply of motor fuel, or the lease of the premises), and thus, violated the PMPA; or (2) that the franchisor made

---

**9.** In two cases involving the identical transaction at issue in this lawsuit, federal district courts have ruled that the assignment from Chevron to Cumberland constituted a nonrenewal of the franchise relationship between Chevron and the dealers, even if the assignment was valid under state law, because Chevron necessarily would not continue as a party to the relationship. *Chestnut Hill Gulf, Inc., et al v. Cumberland Farms, Inc., et al.*, No. 86–3519, 1988 WL 114435 (D.Mass. Oct. 13, 1988), and *Florham Park Chevron, Inc. v. Chevron, et al.*, 2 Bus. Fran. Guide (CCH) ¶ 9011, 1987 WL 17496 (D.N.J.1987). These rulings fail to recognize the very purpose of the assignment event, whereby one party assumes the contractual rights and responsibility of another. Indeed, the whole point of assigning a franchise is to transfer the responsibility of the franchise relationship to the assignee.

This court declines to accept a rule that an assignment necessarily constitutes a terminating event because the assignor does not continue as a party to the franchise relationship. On the basis of 15 U.S.C. § 2806(b), this court determines that the effect of the assignment as a terminating event under the PMPA is determined by reference to state law. A contrary holding would render § 2806(b) meaningless.

Likewise, the court declines to adopt the reasoning and conclusion of the Magistrate's opinion in *Smith v. Cumberland Farms*, D.N. 87–1051 (W.D. Pa., Sept. 16, 1988 Order adopting Mag.'s Report, dated Aug. 15, 1988). In *Smith*, the court found that the mere existence of 15 U.S.C. § 2802(b)(2)(E), the market withdrawal affirmative defense, means that, if a franchisor assigns a franchise and then withdraws from the market, the assignment does not constitute "a mere assignment within the meaning of the PMPA," but is necessarily a termination or nonrenewal. *Smith*, mag. op. at 11.

This reasoning fails to recognize that although the market withdrawal defense includes a wide range of conduct, some of which clearly does constitute a termination or nonrenewal, a market withdrawal does not necessarily constitute a termination or nonrenewal merely because of the existence of a market withdrawal defense.

**10.** The Second Circuit has not yet addressed what constitutes a "constructive termination" under the PMPA.

**11.** The *May–Som* case involved Chevron's sale to Cumberland of its motor fuel marketing assets in Ohio pursuant to agreements essentially identical to those involved in the present case. (Lichtblau Aff. ¶ 25).

the assignment in violation of state law and thus, the PMPA was invoked. *See Fresher,* 846 F.2d at 46–47; *Barnes,* 795 F.2d at 362–64. *See also Little Oil Co., Inc. v. Atlantic Richfield Co.,* 852 F.2d 441, 444 & n. 5 (9th Cir.1988) (examining and approving of the *Fresher* rational) (sic). *May–Som,* 869 F.2d at 922–23.

▮ The central focus, under both 15 U.S.C. § 2806(b) and the *May–Som* analysis, is on the legal entity created by Congress known as the PMPA franchise. This legislative creation, defined by statute, is subject to special protections, and it is the invalid assignment of a PMPA franchise that triggers the PMPA protections. Courts interpreting the statutory definitions of § 2801 have clearly stated that a PMPA franchise consists of three elements. These elements are: (1) the right to occupy leased marketing premises; (2) the right to sell motor fuel under a trademark owned or controlled by a refiner; and (3) the right to be supplied with that fuel. *Barnes v. Gulf Oil Corp.,* 795 F.2d 358, 360 (4th Cir.1986); *Fresher v. Shell Oil Co.,* 846 F.2d 45, 46–47 (9th Cir.1988). As stated by the *Barnes* court, the Act defines a franchise in terms of:

"a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold. *See* S.Rep. No. 731, *supra,* at 29; *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216 n. 2 (7th Cir.1982)" *Barnes,* 795 F.2d at 360.

▮ The relevant issue, therefore, is the validity of the assignment of the three contractual components of the statutory franchise. Plaintiffs correctly note that this court's determination of the validity of the assignment is not limited to a single fact, but rather should include a complete examination of all facts and circumstances. *Dar-*

*ling v. Mobil Oil Corp.,* 864 F.2d 981 (2nd Cir.1988). Because an invalid assignment under state law results in a constructive termination under the PMPA, it is appropriate to view the assignment as a potentially terminating event and therefore apply an "objective" or "reasonableness" test from the perspective of a disinterested observer. *Id.* at 989–90. But the salient inquiry remains, for PMPA purposes, the validity of the assignment of the franchise, as opposed to the assignment, be it valid or invalid, of other contractual rights and responsibilities between the parties.

▮ Applying the first prong of the *May–Som* analysis, plaintiffs have not established that Chevron's assignment to Cumberland breached any one of the three statutory components of the franchise agreement. At the time of the transaction, Cumberland acquired the right to use and authorize the use of the Gulf trademark, with an option to renew indefinitely. Cumberland also acquired rights to the Chevron mark for a period at least as long as the longest assigned contract term. As part of the transaction, Cumberland also purchased the properties leased by the plaintiffs. Cumberland's agreement with Chevron to purchase the output of Chevron's Philadelphia refinery, coupled with Cumberland's other dependable supply sources, evidences Cumberland's capability to supply fuel to its dealers.[12] In sum, the undisputed facts establish that at the time of the assignment Cumberland possessed or had acquired the necessary capability and contractual rights lawfully to fulfill all of Chevron's duties under the franchise agreements.

With respect to the second branch of the *May–Som* analysis, plaintiffs have failed to establish that the assignment of assets from Chevron to Cumberland violated ap-

12. Plaintiff Robert Blosio, d/b/a Long Ridge Service, Inc., by affidavit (Plaintiffs' Ex. EEE) states that on November 25, 1988, he ordered quantities of both regular unleaded and super unleaded gasoline from defendant Cumberland and that only the regular unleaded gasoline was delivered with a note indicating Gulf/New Haven was out of super unleaded gasoline. He also avers he was told in a telephone conversa-

tion that the balance of his order would be dispatched the evening of November 29, 1988. He does not, however, indicate the actual date of the delivery of the product. On the basis of this one incident and the uncertainty as to how long Mr. Blosio was without product, the court cannot find that Cumberland lacks, and at the time of the assignment lacked, the capability of supplying the dealers.

plicable provisions of state law. Thus, the plaintiffs have not met their initial burden of proving the existence of a termination, nonrenewal or constructive termination under the PMPA.

The parties do not dispute that the validity of Chevron's assignment is determined by reference to applicable provisions of Connecticut law. Connecticut law permits the assignment of contractual rights and the delegation of contractual duties. *Latimer Point Management Corp. v. Anderson*, 1 Conn.App. 310, 471 A.2d 670 (1984); *Fletcher–Terry Co. v. Grzeika*, 1 Conn.App. 422, 473 A.2d 1227 (1984); *Rossetti v. New Britain*, 163 Conn. 283, 303 A.2d 714 (1972). Connecticut also follows the general rule that a lease is freely assignable absent some restriction on assignment contained in the lease. *Latimer Point Management Co., supra*, 1 Conn. App. at 315, 471 A.2d 670; Restatement 2d, Property, § 16.2 and Comment d. There is no allegation in the present case that the assigned leases contained within their terms any restriction on assignment by the franchisor.

Because the franchise, by definition, includes a contract for the sale of motor fuel as one of its three components, the transaction is also governed by the Connecticut law of sales contracts. Connecticut has adopted § 2–210 of the Uniform Commercial Code, under which contracts for the sale of goods between a buyer and a seller are made assignable as follows:

(1) A party may perform his duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract. No delegation of performance relieves the party delegating of any duty to perform or any liability for breach.

(2) Unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance.... C.G.S. § 42a–2–210.

On the basis of C.G.S. § 42a–2–210, plaintiffs argue that Chevron's assignment was not valid because (a) the plaintiffs have a substantial interest in having Chevron, as opposed to Cumberland, perform the duties required by the contract; (b) the assignment would materially change the plaintiffs' duties; (c) the assignment would materially increase the burden or risk imposed on the plaintiffs under the contract; and (d) Chevron's assignment would impair materially the plaintiffs' chance of obtaining return performance.[13] In support of these arguments, plaintiffs allege:

1. Since Cumberland is not a refiner, it may lose or choose, of its own accord, to discontinue use of the Gulf trademark;

2. Cumberland may compete directly with the plaintiffs in the retail petroleum market;

3. Cumberland has imposed rental increases under renewal contracts that average 176%;

4. Cumberland, a competitor, controls the price and terms of gasoline deliveries;

5. Cumberland's ability to company-operate threatens the future existence of the plaintiffs' franchises;
    and

6. Chevron's assignment has reduced or destroyed the good will value of each of the plaintiffs' franchises. (Plaintiffs' 11/7/88 brief, pp. 15–31).

■ Plaintiffs have not set forth sufficient evidence to support the legal theories on which they proceed. First, to a large extent plaintiffs' factual allegations simply are not relevant to a consideration of the

---

**13.** Plaintiffs also argue that Cumberland failed to use its "best efforts" to supply and promote the sale of the goods in question in violation of C.G.S. § 42a–2–306(2). (Plaintiffs' 9/30/88 brief, pp. 35–36). Plaintiffs have not established that the contract assigned was an exclusive dealing agreement as required by the statutory section. Even assuming the existence of a "constructive" exclusive dealing term in the contract, plaintiffs have not established that defendants did not use their best efforts to supply and promote the sale of the motor fuel.

validity of the assignment because the allegations do not relate to the unexpired term of the franchise that was assigned to Cumberland. On May 31, 1986, Chevron assigned the unexpired terms of the plaintiffs' three-year franchises to Cumberland. Although the lengths of the assigned terms varied depending on each individual dealer's contract date, at the present time all of the assigned contracts have expired. Thus, plaintiffs' reliance on present or future occurrences to support their allegations of increased burdens or material changes resulting from the assignment are not relevant to the extent they fail to relate to the assigned contracts that have since expired. For example, plaintiffs argue that the significantly increased rent imposed by Cumberland pursuant to its current contracts with the dealers supports a finding that the Chevron to Cumberland assignment violated state law. (Plaintiffs' 11/7/88 brief, pp. 18–19). Current rent figures, paid according to contracts executed after the expiration of the assigned contracts, simply are not relevant to a determination of the validity of the assignment under C.G.S. § 42a–2–210.

■ Second, even if the assigned contracts had not yet expired, plaintiffs' allegations are grounded more in speculation than factual evidence. For example, plaintiffs offer no factual support for their argument that Cumberland may lose or may choose to abandon its right to the Gulf trademark. The unsubstantiated allegation that Cumberland might lose or abandon a valued trademark at some future, unspecified time does not constitute an increased risk or material change in the plaintiffs' contractual rights. *May–Som*, 869 F.2d at 923. Moreover, plaintiffs fail to recognize

that any willful termination by Cumberland of the Gulf trademark would itself constitute a PMPA violation entitling the plaintiffs to invoke the statutory protections at that time. *Fresher*, 846 F.2d at 47 (if, at some future time, the franchisor's assignee breaches any of the statutory components of the franchise agreement, the franchisees can then bring suit under the PMPA).[14]

Finally, to the extent that plaintiffs' allegations are relevant and not speculative, they are largely unsupported by factual evidence. Plaintiffs urge this court to hold the assignments invalid under C.G.S. § 42a–2–210 because Cumberland, as assignee, competed directly with the plaintiffs in the sale of retail petroleum. Although Cumberland undisputedly owns 57 convenience stores selling gasoline in Connecticut, as represented to this court, none of the dealers in deposition testimony identified a Cumberland-operated station in his marketing area. (Defendant Cumberland's 10/21/88 brief, p. 14, n. 5).[15]

Plaintiffs further argue that the fact that plaintiffs' supply and purchase price of gasoline was controlled by Cumberland, a competitor, establishes a distinct threat to the franchisees that did not exist in their relationship with Chevron. First, plaintiffs have not offered any proof that Cumberland failed to supply gasoline in any manner inconsistent with the franchisees' agreement with Chevron for the supply of motor fuel during the assigned contract period. Second, with regard to the purchase price of the gasoline, the court notes that the assigned contracts did not establish a specific price for the sale of the gasoline.[16] On the basis of similar findings, the district court in *May–Som* held:

---

**14.** It is true that PMPA § 102(c)(6) permits Cumberland to terminate franchise relationships because of loss of its trademark, but that permission is lost if:
"... such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor." 15 U.S.C. § 2802(c)(6)

**15.** Cumberland's management has testified that it intends to expand and strengthen its network

of independent Gulf dealers. (Gordon Aff., ¶ 39; Haseotes Aff., ¶¶ 6–8). According to Cumberland, the fact that Cumberland operates service stations at some locations with its own employees does not mean that Cumberland has any less interest than Chevron in being an effective supplier to dealer-operated stations. (Defendant Chevron's 10/21/88 brief, p. 3).

**16.** Chevron's supply agreements with the franchisees who were Chevron dealers provided:
The price Dealer shall pay Chevron for Chevron motor fuels hereunder shall be Chevron's

"First, ... [the dealers] allege that they must pay higher prices for motor fuel. However, the motor fuel supply contracts do not state a specific price at which fuel will be sold to dealers. The ... [dealers] also argue that Chevron ... provided gasoline at a lower price than that charged by competing oil companies, but [that] Cumberland does not. However, the price differential is not provided for in the supply contracts, and thus was not an obligation."

*May–Som,* Bus.Fran.Guide (CCH) ¶ 9000, at 18,326. (footnotes omitted).

Even if the purchase price is relevant to a determination of the validity of the assignment of the franchises, plaintiffs still have not set forth facts to support a cause of action under C.G.S. § 42a–2–210. Under their agreements with Chevron, the franchisees purchased gasoline at Chevron's "dealer tank wagon" ("DTW") price. At that same time, Cumberland was selling gasoline to its company-operated locations at "jobber rack" prices.[17] After the assignment, the plaintiffs continued to purchase gasoline, except now at Cumberland's DTW prices, and Cumberland continued to sell to its company-operated locations at jobber rack prices. Significantly, plaintiffs have not alleged or submitted any evidence to suggest that Cumberland charged the dealers higher prices for the gasoline than were charged by Chevron during the pre-assignment period.[18] Absent such evidence, the fact that Cumberland's company-operated locations purchased gasoline at lower prices does not support a finding of "substantial interest," "material change," "increased burden or risk," or "material impairment" under the Connecticut statute.

In sum, plaintiffs have failed to submit evidence sufficient to establish a genuine issue of material fact. Resolving all ambiguities and drawing reasonable inferences against the defendants, the court concludes that the record taken as a whole could not lead a rational trier of fact to find for the plaintiffs. Defendants' motion for summary judgment is granted on all counts in *Ackley I;* plaintiffs' motion for summary judgment on Counts One, Two and Four is denied.

Because plaintiffs have failed to establish, as a threshold matter, a termination or nonrenewal sufficient to invoke PMPA provisions, the court need not consider defendants' affirmative defense of market withdrawal.

### B. *Ackley II and R.A.C. Car Service*

Plaintiffs have moved for summary judgment on Count One of their Complaint both in *Ackley II* and *R.A.C. Car Service,* arguing that plaintiffs' franchise relationships with Chevron were automatically renewed as mandated by applicable provisions of the Connecticut Petroleum Franchise Act, C.G.S. § 42–133j *et seq.* ("CPFA"). Specifically, plaintiffs' claim that C.G.S. § 42–133*l* (c) provides that all franchises be for a term of at least three years and for continuing and successive terms of at least three years unless the franchise relationship is cancelled or terminated pursuant to applicable law. Plaintiffs cite *Lasko v. Consumers Petroleum of Connecticut, Inc.,* 547 F.Supp. 211 (D.Conn.1981), for the proposition that a petroleum franchise is automatically renewed for continuing and successive three-year periods unless a PMPA nonrenewal or termination has been properly effectuated by a franchisor. (Plaintiffs' 8/26/88 brief, p. 32). According to the plaintiffs, because the defendants have improperly terminated or nonrenewed the plaintiffs' franchises under PMPA stan-

---

posted price to its Chevron dealers generally at the time and place of delivery for the particular product, grade, quantity and type of delivery involved.

Chevron's supply agreements with the plaintiffs who were Gulf dealers provided:

SELLER'S scheduled price in effect at time and for place of delivery.

**17.** The DTW price is generally five to seven cents higher than the jobber rack price. (Plaintiffs' 9/30/88 brief, p. 20).

**18.** Conn.Gen.Stat. § 42a–2–305(2) provides that an "open price" provision requires only good faith on the part of the party who sets the price: "A price to be fixed by the seller or by the buyer means a price for him to fix in good faith."

dards, the plaintiffs are entitled to a summary judgment requiring Gulf or Chevron to continue the original franchise relationships with each of the plaintiffs pursuant to the provisions of their prior franchise agreements.

■ Defendants oppose plaintiffs' motion and move for summary judgment on their own behalf on all counts of *Ackley II* and *R.A.C. Car Service*. Defendants' motion is based, *inter alia*, on the ground that the defendants are not franchisors under the statutory definition of C.G.S. § 42–133k(b). The court concurs. Even if the plaintiffs' franchises were improperly renewed under the PMPA, the provisions of the CPFA do not apply, because plaintiffs have failed to establish that their franchises fall within the scope of the Connecticut statute. For the reasons stated below, plaintiffs' motion for summary judgment on Count One of *Ackley II* and *R.A.C. Car Service, Inc.* is denied. Defendants' motion for summary judgment is granted.

The definition of a franchise under the CPFA is set forth at C.G.S. § 42–133k(b). That section provides:

(b) "Franchise" means an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing motor vehicle fuels and oils and other related products and offering or selling services associated with such products and with gasoline service stations *under a marketing plan or system prescribed in substantial part by a franchisor*, provided nothing contained herein shall be deemed to create a franchisor-franchisee relationship between the grantor and grantee of a lease, license or concession to sell goods or services upon or appurtenant to the premises of the grantor, which premises are occupied by the grantor primarily for its own independent merchandising activities; and

(2) the operation of the franchisee's business *pursuant to such plan or system* is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesalere or jobber and a retailer. (emphasis added).

The statutory definition clearly envisions the existence of a "marketing plan" or "system" prescribed in substantial part by the franchisor. Absent evidence of such a plan or system, the relationship is not a franchise within the meaning of the statute.

In determining whether the control exercised by a franchisor is sufficient to constitute a marketing plan or system, the court is bound to examine facts relevant to the parties' operational relationship. Relevant factors include the franchisor's control over hours and days of operation, advertising, financial support, auditing of books and inspection of premises, control over lighting, employee uniforms, prices, trade stamps, hiring and management training. *Consumers Petroleum of Connecticut, Inc. v. Duhan*, 38 Conn.Supp. 495, 452 A.2d 123 (App.Sess.1982). Although there is no precise formula as to how many of such factors must exist before the control exercised by a manufacturer constitutes a marketing plan or system under the terms of the statute, *Sorisio v. Lenox, Inc.*, 701 F.Supp. 950, 960 (D.Conn.), aff'd 863 F.2d 195 (2d Cir.1988), recent decisions of this court have failed to find statutory franchises on facts similar to the present case.

In *Narumanchi v. Shell Oil Co.*, Civ. No. 83–544 (D.Conn. Nov. 24, 1986) (Mansfield, J., by designation) and *Ross v. Shell Oil Co.*, 672 F.Supp. 63 (D.Conn.1987), agreements between Shell and its franchisees were held not to constitute franchises within the meaning of § 42–133k(b). In *Narumanchi*, the court noted that the dealer hired his own employees and alone supervised the operations of the station. Although Shell representatives visited the station, they did not impose sales quotas or finance the plaintiff's business. The court

found that, according to the express terms of the agreement between the parties, the plaintiff operated independently and was therefore not a statutory franchisee, even though Shell retained rights with respect to the appearance of the station, training of the plaintiff, inspection of the station, credit cards, taxes, customer complaints, insurance, use of Shell uniforms, and indemnity with respect to claims arising out of operation of the station. *Narumanchi,* at p. 4.

*Ross* is essentially indistinguishable from *Narumanchi.* Citing *Duhan* and *Narumanchi,* the court failed to find any facts "which plausibly indicate[d] the existence of a franchise relationship." 672 F.Supp. at 66. The agreement characterized Ross as an "independent businessman" with complete freedom to set the retail price of gasoline and other products sold. The fact that Shell required the Ross station employees to wear prescribed uniforms and that the premises be illuminated adequately, did not, in the court's view, support a contrary result. *Id.* at 66.

Likewise, in the present case, the plaintiffs were individually responsible for the management, operation and marketing of their stations. Plaintiffs maintained complete authority to set the retail price of the various grades of gasoline and diesel fuel. They controlled the hours and days of operation of the station. Defendants had no voice in the hiring or firing of station employees, and did not require the employees to wear certain uniforms. Maintenance of books and financial records was the dealer's responsibility, and the defendants did not audit or review the records. In short, the court has not been presented with evidence sufficient to constitute a "marketing plan or system prescribed in substantial part by a franchisor." Plaintiffs have failed to distinguish the significant precedent in any meaningful manner. While the facts of this case may not be identical to previous cases, plaintiffs are clearly not statutory franchisees under the rule of *Ross* and *Narumanchi.*

Moreover, defendants' description of the plaintiffs as independent businessmen is confirmed by the language of the lease agreements. Article 5 of the Chevron lease agreement unequivocally states that the "Dealer is engaged in an independent business" and that "nothing herein contained shall be construed as granting to Chevron any right to control Dealer's business or the manner in which the same is conducted." Similarly, Article 13 of the Gulf service station lease states:

13. None of the provisions of this Lease shall be construed as reserving to Lessor any right to exercise control over the retail outlet business and operations of the Lessee conducted upon the leased premises, or to direct in any manner how Lessee shall conduct his business. It is understood and agreed that Lessee is an independent businessman and that the entire control and direction of said activities shall be and remain in Lessee, and neither Lessee nor any other person employed by him shall be deemed or considered employees or agents of Lessor.

Significantly, the dealers' own uncontroverted deposition testimony confirms that the dealers' actual relationships with the defendants comported with the language of the leases (*See, e.g.,* O'Neill depo., pp. 93–96, Morello depo., pp. 35–36, Williamson depo., p. 57, as excerpted in Defendant Cumberland's 9/30/88 brief, pp. 65–70).

On other grounds, plaintiffs argue that, even if the defendants did not prescribe a marketing plan or system, plaintiffs are franchisees within the meaning of the last sentence of the statutory definition, which reads in pertinent part "... and includes any agreement between a refiner ... [or] distributor ... and a retailer." § 42–133k(b)(2). On the basis of this language, plaintiffs contend that a "marketing plan is not required to be shown where agreements exist between a 'refiner' and a 'retailer.'" (Plaintiffs' 10/21/88 brief, p. 55). According to the plaintiffs, a review of the cases cited by the defendants indicates "that none of those decisions ever considered the final sentence of § 47–133k(b)." (Plaintiffs' 10/21/88 brief, p. 56).

Five days after the filing of the plaintiffs' brief, this court in *Aurigemma v.*

*Arco Petroleum Products Company,* 698 F.Supp. 1035 (D.Conn.1988), reconsidered but not modified, Ruling on Motion to Reconsider (D.Conn. Jan. 31, 1989), had opportunity to consider the scope of the last sentence of § 42–133k(b). On the basis of that sentence, plaintiffs in *Aurigemma* had argued that a statutory franchisee could be established without proof of the existence of a marketing plan or system. The court disagreed, stating:

> This language does not excuse plaintiffs from establishing the elements which constitute a franchise. The last quoted language was added to prevent petroleum refiners from avoiding the embrace of the definition of franchise by dealing through intermediaries. *See Muha v. United Oil Co.,* 180 Conn. 720, 729–30 & n. 5, 433 A.2d 1009 (1980). Further, the finding of a franchise relationship has been held to be dependent upon proof of the existence and imposition of a marketing plan. *See Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn. Sup. 495, 452 A.2d 123 (1982); *Narumanchi v. Shell Oil Co.,* Civil No. N–83–544 (D.Conn. Nov. 24, 1986), Findings of Fact and Conclusions of Law; *Ross v. Shell Oil Co.,* 672 F.Supp. 63 (D.Conn. 1987). Accordingly, plaintiff must prove the existence of a "marketing plan" in order to bring their agreement under the CFCFA as a franchise.

This court accepts the reasoning of *Aurigemma,* and concurs in its conclusion. Additionally, the court notes that a contrary holding would render everything but the last clause of § 42–133k(b)(2) meaningless.[19]

The court finds that the plaintiffs have failed to establish themselves as franchisees within the definition of CPFA. Accordingly, plaintiffs are precluded from availing themselves of the protections of that statute.

### C. *Count Two*

In Count Two of their complaint, plaintiffs claim that the "significant rental increases sought by, or imposed, by Cumberland on each of the plaintiffs are discriminatory, arbitrary and in bad faith and violative of the standards of both the PMPA and the Connecticut Fair Conduct in Franchising Act, C.G.S. § 42–133j *et seq.*"[20] The plaintiffs claim that the rental fees imposed violate Cumberland's internal rental computation "guidelines." (Complaint, ¶ 19), and discriminate significantly and substantially among the franchise offerings to each of the plaintiffs. (Plaintiffs' 10/21/88 brief, p. 42).

Defendants move for summary judgment on Count Two of plaintiffs' complaint, arguing that the undisputed material facts establish, as a matter of law, that Cumberland offered, in good faith, non-discriminatory franchises to the plaintiffs. Cumberland submits that the rents charged plaintiffs are calculated pursuant to a mathematical formula applied uniformly to all dealer properties. Moreover, the defendants claim that the formula is similar to other rental formulas used in the petroleum industry. According to the defendants, plaintiffs' real complaint is not that the new rents are discriminatory or offered in bad faith, but that the rents are now determined based on a different formula, a formula that happens to result in increases that the plaintiffs would rather not pay. (Defendant Cumberland's 9/30/88 brief, p. 57).

Section 102(b)(3)(A) of the PMPA requires that changes or additions to the franchise relationship proposed by the franchisor at the time of renewal must result

---

**19.** Plaintiffs argue that their agreements with the defendants are characteristic of all agreements in the petroleum industry, and that a finding by this court that the plaintiffs are not franchisees within the meaning of the statute would essentially mean that no dealers are covered by the CPFA. This court is not inclined to make assumptions about industry standards, but, assuming that plaintiffs' assertions are valid, plaintiffs' concerns are more appropriately directed to the state legislature.

**20.** As already noted, The Connecticut Fair Conduct in Franchising Act, previously referred to in this opinion as the CPFA, does not apply to the franchises in question. The court will consider plaintiffs' claim in Count Two under PMPA standards only.

from determinations made in good faith and in the normal course of business.[21] The legislative history of the PMPA indicates the "good faith and normal course of business" test is a subjective determination. *S.Rep. No.* 731, 95th Cong., 2d Sess. 15, reprinted in 1978 *U.S.Code Cong. & Admin.News* 873, 896 (good faith test meant to preclude sham determinations; normal course of business test refers to franchisor's normal decisionmaking process). In cases involving the franchisor's business judgment or marketing strategy, Congress has instructed courts to avoid scrutinizing that decision. *Darling v. Mobil Oil Corp.*, 864 F.2d 981, 990 (2d Cir. 1989); *Palmieri v. Mobil Oil Corp.*, 682 F.2d 295, 296 (2d Cir.1982). "Subjective good faith, i.e. a 'good heart' without evil intent, is all that the statute requires of franchisors." *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1120 (D.Conn.1980). Accordingly, significant rent increases have been upheld absent evidence of lack of good faith. *Meyer v. Amerada Hess Corp.*, 541 F.Supp. 321, 330 (D.N.J.1982) (rental increases of over 300% upheld); *Bellmore v. Mobil Oil Corp.*, 524 F.Supp. 850, 854 (D.Conn.1981) (rental increase from $7,008 to $13,032, that would effectively drive dealer out of the business, upheld); *aff'd* 672 F.2d 899 (2d Cir.1981); *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114 (D.Conn.1980) (rental increase of 200–300% upheld). As succinctly stated by the late Judge Blumenfeld in *Munno:*

[T]he legislative history suggests that courts have been directed to look to the franchisor's intent rather than to the effect of its actions. If it is only using proposed changes to the lease to disguise an illegal attempt to discriminate against the franchisee and thereby drive him from business, the court is empowered to interfere. If, on the other hand, a good faith application of a rental formula operates unreasonably in a particular case, the dictates of the marketplace alone will govern the transaction. This interpretation is completely in accord with the perceived abuse which Congress sought to rectify. *Munno*, 488 F.Supp. at 1119.

In the present case, there can be no dispute that many of the rent increases proposed by Cumberland represent significant and substantial increases.[22] Cumberland attributes the increases to the fact that previous rents remained substantially stable over a period of time, despite significant increases in the fair market value of the leased property over that same period. (*See* Plaintiffs' 9/30/88 brief, pp. 7–8). Significantly, all rents, including those decreased as well as those increased, were calculated by Cumberland pursuant to the same, uniform mathematical formula. The computed rent is one-twelfth ($\frac{1}{12}$) of the sum of (a) an objective valuation of the fair market value of the property, multiplied by an eleven per cent (11%) rate of return on the value of the property, and (b) the taxes on the property. (Gordon Aff. ¶ 34). Stated schematically,

---

**21.** In Count Two, plaintiffs allege that the increased rents proposed by Cumberland violate PMPA standards, but they do not indicate the specific PMPA section to which they refer. The plaintiffs' opposition brief likewise offers no guidance.

Because the market withdrawal standard of 15 U.S.C. § 2802(b)(2)(E)(iii)(II) is not relevant in light of the present ruling, the logical basis for plaintiffs' claim is § 2802(b)(3)(A), and the court proceeds on that basis.

**22.** The statistical evidence is represented differently by each party. Plaintiff claims rental increases ranging from zero to seven hundred and sixty-one per cent. *See* Schedule B attached to Plaintiffs' 9/30/88 brief, listing the plaintiffs' individual increases as follows: Chayka, 159%; Lombardo, 130%; Zawatski, 17.2%; O'Neill,

224%; Ciarcia, 109%; Cohn, 333%; Cerritelli, 163%; Williamson, 52%; Todd, 150%; Montague, 0%; Blosio, 358%; Condito, 201%; Schley, 58%; MaGuire, 40%; Haviland, 761%; Morello, 62.5%.

Charts submitted by the defendants represent that the rental increases were not uniformly high, but varied from a high 167% to a low of –18%. (Defendant Cumberland's 10/21/88 brief, p. 18 n. 7, and attached schedules). Defendants claim that the average first-year rental increase for all of the plaintiffs under the new formula was approximately 52%. Two plaintiffs allegedly experienced decreases in their rent of 13% and 22%, respectively. (*See* Gordon Affidavit, at ¶ 38; Defendant Cumberland's 9/30/88 brief, p. 51 n. 15). The defendant's charts are supported by sworn affidavits attesting to the accuracy of the computations.

$$\text{Monthly Rent} = \frac{(11\% \times \text{Appraised Property Value}) + \text{Taxes}}{12}$$

The Cumberland rental formula is similar to other rental formulas used in the oil industry. *See Beirne v. Getty Petroleum Corp.*, 707 F.Supp. 632 (E.D.N.Y.1988), *aff'd per oral opinion*, 863 F.2d 45 (2d Cir.1988). Furthermore, Cumberland has voluntarily phased in the new rent formula over the three-year period of the dealers' leases. (Gordon Aff. ¶ 35).

If a dealer believes that Cumberland's valuation of the premises is too high, a procedure is in place whereby the dealer may obtain his own valuation of the property and challenge the Cumberland valuation under Cumberland's Rent Review Program (Gordon Aff. ¶ 37). If Cumberland disagrees with the valuation proffered by the dealer's appraiser, Cumberland obtains another appraisal from an independent, certified appraiser. The dealer's appraisal and Cumberland's second appraisal are then averaged and that result is used in the rental formula.

There has been no representation brought to the attention of the court that any of the plaintiffs have availed themselves of the opportunity to challenge Cumberland's assessment of any station's rent under the Rent Review Program. Plaintiffs acknowledge the existence of the program, but dispute, without elaboration, that the program provides any meaningful alternative to the plaintiffs. (Plaintiffs' St. of Disputed Facts, 10/21/88, ¶ 29, p. 5).

The objective rental formula and its uniform application, the phase-in period, appraisal procedures and Rent Review Program all constitute objective evidence of Cumberland's good faith. Despite voluminous filings and affidavits, plaintiffs have failed to produce any evidence establishing that the rent increases deviated from Cumberland's established procedures or policies, or that the increases were used to disguise a bad faith attempt to harm the franchisees. Plaintiffs' conclusory allegations about Cumberland's evil motives do not defeat the defendants' motion for summary judgment. *Celotex Corp. v. Catrett*,

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Absent evidence that the rental formula was employed by the franchisor in bad faith, summary judgment is appropriate. *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1120–21 (D.Conn.1980); *Nesheiwat v. Mobil Oil Corp.*, Bus. Fran. Guide (CCH) ¶ 8283, at 14,941, 1984 WL 3651 (C.D.Cal.1984) (issue of franchisor good faith does not preclude summary judgment where evidence fails to establish issue of material disputed fact).

*Plaintiffs' CUTPA Claims*

Plaintiffs' complaints in all three actions allege various violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S. § 42–110a *et seq.* Plaintiffs' CUTPA claims are based on the same allegations that have formed the basis of their claims under the PMPA and CPFA. To the extent that plaintiffs' CUTPA claims are based on alleged violations of the petroleum statutes, in light of the court's ruling plaintiffs' claims are now moot. *Sorisio v. Lenox, Inc.*, 701 F.Supp. 950 (D.Conn.), *aff'd* 863 F.2d 195 (2d Cir.1988). As a matter of law, plaintiffs have not established evidence of a CUTPA violation, and defendants' motion for summary judgment on these counts is granted.

## IV  CONCLUSION

In conclusion, the court is not unsympathetic to the concerns and fears of the plaintiffs who, as small businessmen, witnessed the occurrence of a billion dollar transaction in which their franchises were assigned to a franchisor that, they believe, intends to take over their businesses. However, in the several hundred pages of legal memoranda submitted to the court, plaintiffs lost sight of the legal theories on which they proceed. Plaintiffs' conclusory allegations and lengthy factual dissertations, unsupported by evidence, do not serve to defeat defendants' summary judgment motions.

This is not entirely plaintiffs' fault. The PMPA was never intended to apply to the major, national acquisition that plaintiffs challenge in this lawsuit. Rather, Congress enacted the PMPA in order to establish "protection for franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." *S.Rep. No.* 95–731, 95th Cong., 2d Sess. 15 (1978), reprinted in 1978 *U.S.Code Cong. & Ad.News* 874. As noted by the court in *Russo v. Texaco,* 630 F.Supp. 682, 688 (E.D.N.Y. 1986), *aff'd* 808 F.2d 221 (2d Cir.1986):

> There is nothing in the language of the Act suggesting that a major national acquisition and large scale divestiture for bona fide business reasons was intended to be stymied by the right of individual franchisees to insist on a prior relationship on exactly its former terms. A permanent status quo in the relationships of major national oil corporations with each other was not mandated by Congress through the PMPA. In a rapidly changing economy fixed preservation of business relationships may spell financial death to the detriment of franchisees as well as franchisors. Change may be required for survival.

. . . . .

The legislation recognized the "legitimate needs of a franchisor to be able to terminate a franchise based upon ... changes in circumstances." S.Rep. No. 95–731, 95th Cong., 2d Sess. 18–19, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873, 877. Congress expressly recognized "the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing marketing conditions and consumer preferences." *Id.* at 19, 1978 U.S.Code Cong. & Ad. News at 877. *Russo,* 630 F.Supp. at 688–89.

For the reasons set forth in this opinion, defendants' motions for summary judgment on all counts are granted; plaintiffs' motions for summary judgment are denied.

SO ORDERED.

SCHEDULE A—PLAINTIFFS' STATUTORY FRANCHISE RENEWAL DATES AND
DATES OF FIRST RECEIPT OF PROPOSED CUMBERLAND "RENEWAL" DOCUMENTS

| Dealer | Brand Name | Address | 1984 Renewal/ Commencement | Date of Receipt of Proposed "Renewal" Documents | 1987 Statutory Renewal Date |
|---|---|---|---|---|---|
| 1. Robert Blosio/Long Ridge Chevron, Inc. | Chevron | 1095 Long Ridge Road Stamford, CT 06903 | May 1, 1984 | February 20, 1987 | May 1, 1987 |
| 2. Vincent Condito dba Vinny's Courtland Chevron | Chevron | 1125 East Main Street Stamford, CT 06902 | January 1, 1984 | February 6, 1987 | January 1, 1987 |
| 3. George S. Lombardo Jr./Avon Chevron Service Station, Inc. | Chevron | 1492 High Ridge Road Stamford, CT 06903 | January 1, 1984 | February 7, 1987 | January 1, 1987 |
| 4. James Chayka/Home Gulf Service Station, Inc. | Gulf | 690 Post Road East Westport, CT 06880 | June 1, 1984 | April 30, 1987 | June 1, 1987 |
| 5. Frederick O'Neill dba Chevron Car Wash | Chevron | 3400 Boston Post Road Southport, CT 06490 | July 1, 1984 | May 5, 1987 | July 1, 1987 |
| 6. David Maguire/Al & Bill's Service, Inc. | Gulf | 36 South Avenue New Canaan, CT 06840 | March 30, 1984 | March 3, 1987 | March 30, 1987 |
| 7. Douglas Schley dba Fairfield Gulf | Gulf | 975 Kings Highway Fairfield, CT 06430 | February 21, 1984 | February 7, 1987 | February 21, 1987 |
| 8. Thomas Zawatski dba Cos Cob Gulf | Gulf | 370 East Putnam Avenue Greenwich, CT 06807 | May 1, 1984 | February 20, 1987 | May 1, 1987 |
| 9. Donald Haviland/ Chevron Car Wash of New Canaan, Inc. | Chevron | 215 Elm Street New Canaan, CT 06840 | August 1, 1984 | July 1, 1987 | August 1, 1987 |
| 10. Santo J. Ciarcia dba Glastonbury Chevron | Chevron | 2875 Main Street Glastonbury, CT 06033 | September 1, 1984 | June 30, 1987 | September 1, 1987 |

| Dealer | Brand Name | Address | 1984 Renewal/ Commencement | Date of Receipt of Proposed "Renewal" Documents | 1987 Statutory Renewal Date |
|---|---|---|---|---|---|
| 11. Frank Ackley dba Village Square Chevron | Chevron | 405 Monroe Turnpike Monroe, CT 06468 | January 1, 1984 | February 7, 1987 | January 1, 1987 |
| 12. Paul Morello dba Morello's Gulf/ Morello's Service Station | Gulf | 339 South Main Street Middletown, CT 06547 | January 1, 1984 | February 7, 1987 | January 1, 1987 |
| 13. Robert A. Cohn/ R.A.C. Car Service Inc. | Gulf | 1101 Boston Post Road Fairfield, CT 06430 | November 1, 1984 | September 4, 1987 | November 1, 1987 |
| 14. Kenneth Cerritelli d/b/a Cerritelli Chevron Service Inc. | Chevron | 4464 Main Street Bridgeport, CT 06606 | December 1, 1984 | October 15, 1987* | December 1, 1987 |
| 15. George Williamson d/b/a Auto Electric Inc. | Gulf | 666 Plank Road Waterbury, CT 06705 | November 1, 1984 | September 15, 1987* | October 1, 1987 |

| Dealer | Brand Name | Address | 1985 Renewal/ Commencement | Date of Receipt of Proposed "Renewal" Documents | 1988 Statutory Renewal Date |
|---|---|---|---|---|---|
| 16. John T. Todd d/b/a Danbury Gulf | Gulf | 95 Lake Avenue Danbury, CT 06810 | July 1, 1985 | January, 1988 | July 1, 1988 |

* Approximately